DOROTHY VICKERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vickers v. Commissioner
Docket No. 2129-75.
United States Tax Court
T.C. Memo 1977-90; 1977 Tax Ct. Memo LEXIS 353; 36 T.C.M. (CCH) 391; T.C.M. (RIA) 770090; March 30, 1977, Filed *353 Transaction wherein petitioner gave a deed to real estate and received an option to repurchase for a stated price was a security arrangement rather than a sale. Petitioner incurred a deductible loss in 1972 when she failed to exercise the option to repurchase and the property was sold by the optionor. Paul B. Baer, for the petitioner. Matthew W. Stanley, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in the joint income tax liability of petitioner, Dorothy Vickers, and her husband, Jimmie L. Vickers, for the year 1972 in the amount of $1,508.54. Jimmie L. Vickers did not file a petition with this Court and is not a party to these proceedings. Due to certain concessions by petitioner, Dorothy Vickers, the issue for decision is whether petitioner suffered a loss on the transfer of a parcel of real estate in Anchorage, Alaska, if so, how much of a loss, and whether the loss was incurred in the year 1971 or the year 1972, the latter being the only year before the Court. Some facts were stipulated and are so found. Petitioner and her husband, Jimmie L. Vickers (herein-after *354 referred to as Jimmie), filed a joint income tax return for the year 1972 with the Internal Revenue Service Center in Ogden, Utah. At all times pertinent to this case petitioner resided in Anchorage, Alaska. In about May of 1969 petitioner and Jimmie (herein-after collectively referred to as the Vickers) arranged to purchase rental property in Anchorage from Clarence B. Ladd. There were a small frame house and a frame duplex apartment on the lot which were used for rental purposes. Both the house and the duplex were in rather poor condition. The arrangements with Ladd were that the Vickers would make payments to Ladd until they had paid $3,500 as a downpayment and then an escrow would be established for payments of the balance of the purchase price. By January of 1970 the Vickers had paid Ladd $3,515 and an escrow was established with the National Bank of Alaska providing for the payment of an additional $7,058.84, payable $250 monthly beginning January 15, 1970, including 6 percent interest from January 1, 1970. At the time the contract was made the improvements on the property were rented for $250 per month. Various payments were made to the escrow at various times during *355 1970, 1971, and 1972. The balance of principal due on September 10, 1971, was $2,986 and on December 22, 1972, was $1,356. Best-Way Trucking Co., Inc. (hereinafter Best-Way) was an Alaska corporation originally owned by Jimmie, Odell Townsend and Robert Kelly. On or after September 10, 1971, Best-Way was owned by Jimmie and Townsend. Best-Way was in the trucking business. Its trucking equipment was financed by the C.I.T. Corp., and as of September 10, 1971, the equipment was in the possession of C.I.T. Corp. because Best-Way had failed to meet the payments on its obligation. Best-Way obtained from the Small Business Administration a commitment to guarantee 90 percent of a loan in the amount of $66,000 to be used to repossess its equipment and operate its business. The Alaska State Bank agreed to make the loan, thereby risking 10 percent of the face amount of the loan, but only on condition that Best-Way raise an additional $15,000 of capital. In an effort to raise the additional capital for Best-Way Jimmie asked a friend, Jack Johnson, to help him get a loan of $15,000 using as security the duplex property owned by the Vickers, an improved lot in Fairbanks owned by Townsend, *356 and an unimproved lot in Anchorage owned by City Citizen Construction, Inc., a corporation in which Jimmie, Townsend and Kelly were officers and stockholders. Johnson contacted Wallace F. Burnett, partial owner and secretary of Polaris Investment Corp. (hereinafter Polaris) of Fairbanks, seeking the loan. After viewing the properties Burnett told Johnson that he could not make a loan on the properties but would buy them for $15,000. Johnson made arrangements to close the transaction by having Jimmie's attorney draw up the necessary papers. On September 10, 1971, each of the Vickers, Townsend, and City Citizen Construction, Inc. executed warranty deeds conveying their respective properties to Polaris Investment Corp. The consideration stated in the Vickers' deed was "One Dollar ($1.00) and other valuable considerations." The conveyance was subject to the contract of sale between the Vickers and Ladd, and the grantee assumed and agreed to pay the indebtedness secured by the described contract of sale. Polaris had the warranty deeds recorded. Polaris gave its check in the amount of $15,000 made payable to Best-Way. At the same time Polaris also executed a document giving the *357 Vickers, City Citizen Construction, Inc., and Townsend an option, for a period of 180 days, to purchase the same three parcels of land for $20,000, payable upon delivery of the deeds. Warranty deeds executed by Polaris under the same date conveying the three properties back to the three respective owners were deposited with Johnson as escrow agent to hold during the option period. The $15,000 check was endorsed in behalf of Best-Way and cashed. From the proceeds, $1,000 was given to Johnson as a loan or commission, [1] and $14,000 was used to acquire a Time Certificate of Deposit in the names of Townsend and Kelly at the Alaska State Bank. Most of the $14,000 was applied by the bank to payments on its loan to Best-Way [2] until it was exhausted.Best-Way defaulted on its payments on the loan and presumably the Small Business Administration paid the Alaska State Bank the balance then due on the $66,000 loan because of its guarantee of up to 90 percent of the face amount thereof. Best-Way became insolvent and was still obligated to the Small Business Administration on the loan at the time of trial.
*358 Despite an extension of the option time, the optionees were unable to raise the $20,000 and in the latter part of 1972, Polaris turned the Vickers' property over to a real estate agent to sell. That property was sold by Polaris in September or October of 1973 for $10,500. The optionees paid nothing on the purchase price during the option period, and no part of the $15,000 was repaid to Polaris by Best-Way or anyone else. The Vickers received none of the proceeds from the sale of the property and Polaris made no effort to collect any part of the $15,000 from the Vickers. After September 10, 1971, the Vickers continued to manage the rental property until it was put up for sale by Polaris. They made occasional visits to the property to take care of repairs and maintenance. They collected the rent and paid it into the Ladd escrow to be applied on the amount due Ladd under his contract of sale with the Vickers. This was done with the approval of Burnett, who lived in Fairbanks and could not oversee the property. On December 22, 1972, the balance due on the Ladd contract was $1,356, which Polaris paid on April 27, 1973. On their joint income tax return for 1972 the Vickers *359 reported rental income from the rental property in the amount of $1,500. They also reported rental expenses in the amount of $2,865 and depreciation in the amount of $296, thus reporting a net rental loss of $1,661. Depreciation was claimed for 8 months of the year. In his notice of deficiency respondent disallowed $710 of the claimed rental expenses and decreased the rental loss allowable "because it has not been established that any deductible loss was sustained in excess of $951.00 during the taxable year." The "Substantiated rental expenses" were listed, which included interest, taxes, electricity, heat, water and refuse, depreciation, and miscellaneous expenses, for a total of $2,451. In her petition Dorothy alleged error in the disallowance of the other rental expenses claimed, but she offered no evidence to substantiate those expenses at trial, and we conclude she has waived that issue. The Vickers also claimed an ordinary loss on the sale of the rental property on their 1972 return in the amount of $7,364. The description of the transaction was that the property, which had been acquired in May 1969, was "repossessed" in December 1972. The cost basis reported was $10,000 *360 less depreciation of $1,280 and the sales price reported was $1,356 (which was the balance due on the Ladd contract of sale in December of 1972 which Polaris paid in April 1973). In the notice of deficiency respondent disallowed the entire amount of the loss claimed on the return "because it has not been established that any deductible loss was sustained during the taxable year." ULTIMATE FINDING OF FACT The Vickers incurred a loss on the disposal of their lot and improvements in Anchorage, Alaska, in 1972 in the amount of $1,179 which is deductible as an ordinary loss in 1972. OPINION The only issue remaining for our decision is whether petitioner and her husband, Jimmie Vickers, suffered a loss in a transaction involving real estate she and her husband owned entered into with Polaris Investment Corp. on September 10, 1971, and, if so, whether the loss was deductible in 1971 or 1972. If we conclude that the loss is deductible in 1972, which is the only year before us, we must also determine the amount of the loss.
In order to acquire additional capital in the amount of $15,000 for Best-Way, a corporation in which the Vickers were officers and stockholders, on September 10, 1971, the *361 Vickers and others conveyed three parcels of real estate, one of which was owned by the Vickers, to Polaris by warranty deeds.Polaris issued its check in the amount of $15,000 to Best-Way. Simultaneously therewith Polaris gave the three former owners a 180-day option to purchase the three properties for $20,000. The optionees were unable to raise the $20,000, and Polaris turned the Vickers' property over to a real estate agent to sell in the latter part of 1972. The Vickers received none of the proceeds of the sale. Petitioner claims that the transaction, while in form a sale, was intended to be and was in fact a loan or security transaction which culminated in the loss of her property in 1972, thereby producing a loss deductible for tax purposes in 1972. Respondent's position on brief is (1) that the transaction with Polaris constituted a sale of petitioner's rental property, (2) if petitioner suffered a loss on the transaction the loss was incurred in 1971 and is not deductible in 1972, and (3) regardless of whether the transaction is viewed as a sale or a security transaction, petitioner has failed to establish a loss greater than $2,842. Initially we look to the law of *362 Alaska in characterizing the transaction. The Alaska law on whether a transaction represents a sale or a security arrangement is set forth in , which adopted the rule that the intention of the parties at the time of the execution of the instrument determines whether it is a deed or a security instrument. The opinion lists several circumstances which may be considered in making the determination, such as the adequacy or inadequacy of consideration as compared to the value of the property, retention or nonretention of possession, the conduct of the parties before and after execution of the instrument, the financial condition of the grantor at the time of execution of the instrument, the relationship of the parties, whether the grantor or grantee paid the taxes, and the construction of improvements after the execution of the deed. But beyond local law, Federal tax law also recognizes that substance rather than form should control the characterization of the transaction, and that a deed, even though absolute in form, may be treated as a mortgage *363 if it is executed as security for a loan. , affd. , affd. ; . Aprimary factor governing whether a transaction is a sale or a security arrangement is the parties' intentions, gathered from the instruments themselves and from the attending facts and circumstances. ;. The instrument here involved, the warranty deed from the Vickers to Polaris, is on its face an unconditional warranty deed. It granted the real estate to Polaris for a stated consideration, subject to the contract of sale to Ladd, the obligations under which Polaris assumed. There was no mention in the deed of a security arrangement and no note was executed evidencing a loan. Since the deed was absolute on its face the transaction must be considered a sale unless it can be shown by clear and convincing evidence that it was intended to be a mortgage or security transaction. ; *364 . [3] However, we are convinced from all the evidence and the relevant facts and circumstances that the transaction was intended to be a security transaction in the form of a deed coupled with an agreement to recovery upon payment of a specified sum which became an absolute sale when the Vickers failed to exercise their option to repurchase the property within the option period.
There may not have been a clear meeting of the minds of the parties to the transaction. The Vickers testified unequivocally that it was their intention and understanding that the transaction constituted a loan with their property being used as security. On the other hand, Burnett, who was acting for Polaris, testified that the transaction was a sale and that Polaris would not have made a loan on the property. However, it seems clear from the fact that Polaris simultaneously granted the Vickers an option to repurchase the property and actually executed a warranty deed which, if delivered, would have unconditionally *365 conveyed the property back to the Vickers, that the transaction had the overtones of a security transaction rather than a permanent sale. See , wherein the court said: This conclusion [that the transaction was a loan] is based on a slight variation of the familiar maxim that where a deed, absolute on its face, is coupled with an agreement to reconvey upon payment of a stipulated sum, the transaction is ordinarily nothing more than a mortgage. * * * [Cits. omitted; .] We do not question Burnett's sincerity in characterizing the transaction as a sale because a warranty deed was used to complete the original part of the transaction, but we believe the form in which the transaction was cast was simply a convenient form for obtaining security for a loan. If the Vickers repaid the loan plus the additional charge within the option period, the property was theirs. But if they failed to pay the option price, the property could be taken over and sold by Polaris without the necessity of a foreclosure sale. The factors for consideration mentioned in the Rizo case, supra, do not suggest a conclusive *366 determination either way. Based on the cost to the sellers of the properties and the assessed values of the properties, the three properties had a combined value considerably in excess of $15,000 which would suggest that the transaction was a loan. However, based on Burnett's personal appraisal of the real estate, which was all he was interested in, when coupled with the fact that Polaris assumed the Vickers' unpaid obligation to Ladd, suggests that Polaris paid about what Burnett thought the three properties were worth and that the transaction was a sale. The evidence is conflicting as to whether the Vickers retained management control of the property after the transaction in their own right or in behalf of Polaris at Burnett's request. It seems clear, however, that the Vickers paid the taxes, the utilities, and other expenses on the property for the year 1972 and were allowed a deduction therefor on their 1972 return. In fact, respondent allowed the Vickers rental expense deductions totaling $2,451 for 1972, which is somewhat inconsistent with his contention that the Vickers sold the property in 1971. The Vickers were in need of funds prior to the transaction which might suggest *367 either a loan or a forced sale because the parties apparently had no prior relations with each other. Taking all factors into consideration, we believe it is clear that the transaction between the Vickers and Polaris in 1971 was intended as a security transaction and took the form of a sale and option to repurchase for the convenience of Polaris. Thus, any loss incurred by the Vickers on the transaction was realized in 1972 when the option period expired without exercise of the option and Polaris took the property over for sale. We must now determine the amount of the loss. On brief respondent argues, alternatively, that if petitioner incurred a loss on the transaction in 1972, the loss did not exceed $2,842. This is computed by determining that the Vickers' cost basis in the real estate was $10,574, which included the downpayment of $3,515 and the installment obligation to Ladd of $7,058.84. On reply brief respondent reduces the $7,058.84 by $358.84 as including interest due at the time the escrow was established. In the proposed findings of fact in her opening brief petitioner also computed her cost basis to be $10,573 less $358.84 interest, or $10,215. While the record *368 is unclear on this point, we will accept the computations of the parties that petitioner's cost basis in the real estate was $10,215. Respondent properly points out that this must be reduced by $1,280 depreciation allowed petitioner while she owned the property, leaving her an adjusted basis in the property in 1972 of $8,935. The next question is how much did petitioner receive for the property, if anything. The Vickers claim the only benefit they received from the property was the $1,356 balance due on their contract with Ladd which Polaris assumed and paid. Respondent argues that petitioner received a benefit of $2,986 by Polaris' assumption of the contract obligation to Ladd. The balance due on the contract when Polaris assumed the obligations of the contract on September 10, 1971, was $2,986. However, additional payments were made on the contract from the rent received from the property between September 10, 1971, and the time Polaris took over the property for sale in December 1972, at which time the balance due was $1,356. Since we have found that the Vickers continued to own the property until Polaris took it over for sale sometime in the latter part of 1972, and since *369 the Vickers reported the rental income received from the property on their 1972 return, we conclude that they are entitled to credit for the payments to Ladd in 1972, and benefitted only to the extent of $1,356 by Polaris' assumption of the obligation to Ladd. However, that is not all the benefits they received from Polaris. The evidence indicates that Polaris dealt only with the Vickers, Townsend, and City Citizen Construction, Inc., and not with Best-Way. Under the circumstances we believe the transaction must be considered as a loan of $15,000 from Polaris to the three owners of the property put up as security for the loan, and then a contribution of capital by the Vickers, at least, to Best-Way. Unfortunately, the parties made no effort to break down the loan between the borrowers or even to break down the $15,000 stated purchase price between the three properties involved. However, Burnett testified that he valued the Vickers' property at $6,400, the lot in Anchorage at $6,000, and the property in Fairbanks at $4,700. The value he placed on the Vickers' property was on the land alone; he placed no value on the improvements. While this is rather meager evidence on which *370 to base an allocation, we believe it is the best evidence available as to what part of the $15,000 was attributable to the Vickers. We therefore conclude that the Vickers received an additional benefit of $6,400 on the transfer of their property. Unlike respondent, however, we believe the $1,356 balance on the Ladd obligation, which Polaris paid, must be added to the $6,400 so that the total benefits received by the Vickers were $7,756. Since we have found that petitioner's adjusted basis in the property was $8,935, we conclude that petitioner is entitled to deduct a loss of $1,179 as a result of the transfer of the property in 1972.Any additional loss the Vickers may have suffered would be attributable to their investment in Best-Way, which is not an issue before us. Decision will be entered under Rule 155. Footnotes
1. From the record it is not clear which. ↩
2. It is unclear from the record whether the $14,000 was used to repossess Best-Way's equipment, as the briefs of the parties suggest, or was applied on the $66,000 loan. It is our impression from all the evidence, however, that the loan was used to repossess Best-Way's equipment, and that the $14,000 was used to meet payments on the loan.↩
3. See , and cases cited therein.↩